**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **Chapter 13** |
| **MARGARET LOUISE LARMAN,** | ) | |
| | ) | **Case No. 16-71624** |
| Debtor. | ) | |

| | | |
|---|---|---|
| **MARGARET LOUISE LARMAN,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adv. Proc. No. 17-07001** |
| | ) | |
| **U.S. DEPARTMENT OF HOUSING** | ) | |
| **AND URBAN DEVELOPMENT,** | ) | |
| **AMERICAN ADVISORS GROUP,** | ) | |
| **REVERSE MORTGAGE SOLUTIONS,** | ) | |
| **INC., SAMUEL I. WHITE, P.C.,** | ) | |
| **CHRISTOPHER MICALE, CHAPTER** | ) | |
| **13 TRUSTEE, and FINANCE OF** | ) | |
| **AMERICA REVERSE, LLC,** | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This Adversary Proceeding was filed by the Debtor, Margaret Louise Larman ("Debtor"),

against the United States Department of Housing and Urban Development ("HUD"), American

Advisors Group ("AAG"), Reverse Mortgage Solutions, Inc. ("RMS"), Samuel I. White, P.C.

("SIW"), Finance of America Reverse, LLC ("FAR"), and the Chapter 13 Trustee.  The facts of

this case arise from a Home Equity Conversion Mortgage ("HECM"), or reverse mortgage,

entered into by the Debtor's late husband, Benjamin K. Larman ("Mr. Larman").  The HECM is

on the Debtor's principal residence (the "Property").

The Debtor is seeking declaratory judgment against HUD stating that it failed to implement certain anti-displacement protections into the HECM program in contravention of the enabling legislation and that certain HUD regulations and guidance are in violation of the Administrative Procedures Act ("APA").  In addition, the Debtor is seeking an order requiring HUD to accept assignment of the Deed of Trust at issue in the case.  The Debtor is also seeking an order quieting title to the Property, finding that the Debtor is the owner in fee simple, and voiding the HECM against the Property.   Finally, the Debtor is seeking an order permanently enjoining AAG and its assignees and agents from proceeding with a foreclosure sale under the HECM.

Presently before the Court are Motions to Dismiss filed by HUD and AAG as well as the Debtor's responses thereto.  The Court conducted a hearing on these motions on July 10, 2017, and the matters are ripe for resolution.  For the reasons stated below, the Court will grant HUD's Motion to Dismiss and deny AAG's Motions to Dismiss.

## FACTUAL BACKGROUND[1]

On November 30, 1988, Mr. Larman purchased real property located at 365 Hill Street in Christiansburg, Virginia (the "Property").  The purchase was financed by the United States Department of Veterans Affairs (the "VA") and secured by a Deed of Trust.  On February 19, 1994, Mr. Larman and the Debtor were married.  At that time, Mr. Larman was forty-nine (49) years old and the Debtor was twenty-nine (29) years old.

---

[1] The factual background contained in this opinion has been drawn from the First Amended Complaint and the exhibits attached to the Plaintiff's initial Complaint. In reviewing a motion to dismiss under Rule 12(b)(6), the Court must take as true the well-pleaded factual allegations in the Plaintiff's complaint. *Bass v. E. I. DuPont de Nemours & Co.,* 324 F.3d 761, 764 (4th Cir. 2003); *In re LandAmerica Fin. Grp., Inc.,* 470 B.R. 759, 772 (Bankr. E.D. Va. 2012).

On March 6, 1997, the Property was transferred by Deed of Foreclosure from Mr. Larman to the Secretary of the VA.  On September 26, 1997, the Secretary of the VA conveyed the Property to Mr. Larman and the Debtor, in fee simple as tenants by the entireties with the right of survivorship.  On the same day, Mr. Larman and the Debtor executed a Deed of Trust securing a loan from the VA for the purchase of the Property.  The amount secured by the Deed of Trust was $49,308.00, to be paid in monthly payments of $354.23 per month over a term of 360 months.[2]

Mr. Larman became disabled in 2008 after suffering a stroke, and he then qualified for social security disability payments.  Following his stroke, he was under the care of medical providers at the VA and began suffering from other significant health problems, such as metastatic lung cancer.  As a result of these medical complications and the costs related thereto, the Debtor and Mr. Larman began having severe financial problems.

After seeing an AAG reverse mortgage advertisement on television, the Debtor and Mr. Larman contacted AAG by telephone to learn more about the product.  According to the Debtor, the advertisement stated that there would be no payments under the reverse mortgage and that the owners could keep their homes.  Over the next several weeks they talked by phone with AAG representatives on three to six occasions.  They were advised that by using the equity in the Property, they would be able to pay off the existing mortgage, as well as their other creditors. From the statements made in the advertisement and during conversations with AAG, Mr. Larman and the Debtor continued to believe that they would not have to make payments and could both remain in the home if they were to obtain a reverse mortgage.

---

[2]   The amounts alleged in the Amended Complaint vary slightly from the actual amounts in the Deed of Trust.  This variance does not affect the Court's decision.

On or about June 24, 2011, Mr. Larman and the Debtor talked by phone with a counselor from Housing Options Provided for the Elderly Hope-NC.  This counselor was selected from a list provided by AAG.  They continued to believe they could remain in the home after speaking with the counselor.

On September 7, 2011, a representative from AAG came to the home to meet with Mr. Larman and the Debtor.  During this meeting, the AAG representative presented Mr. Larman and the Debtor with a package of documents to be signed to obtain the reverse mortgage.  These documents had been prepared by AAG, and the Debtor and Mr. Larman had not seen them prior to the meeting.  During this meeting, the AAG representative presented Mr. Larman and the Debtor with a prepared deed by which they would transfer ownership of the property solely to Mr. Larman.  The representative explained that the Debtor did not qualify for a reverse mortgage because of her age, and that the reverse mortgage would only be possible if the Property were transferred to Mr. Larman.  Because they felt the reverse mortgage was necessary to solve their financial problems, Mr. Larman and the Debtor executed the deed.  The Debtor asserts that this was done in reliance on the belief that the Debtor would be able to remain in the home if Mr. Larman passed away first.  During this meeting, Mr. Larman executed two Deeds of Trust, one of which with HUD as a beneficiary.

As a result of the reverse mortgage, the VA was paid in full.  The Debtor believes that all other creditors were paid in full as well.  As of the date of the meeting with AAG, the Debtor asserts that Mr. Larman was suffering from severe health and cognitive problems and it is unclear whether he understood the transaction.  Neither the Debtor nor Mr. Larman had any significant experience in financial or real estate matters at the time of the September 7, 2011 meeting.

4

At some point after that date, RMS became servicer of the loan secured by the Deed of Trust.  In addition, FAR became the owner of the loan secured by the Deed of Trust.

On January 21, 2015, Mr. Larman passed away from small cell carcinoma of the lung and secondary malignant neoplasm of the brain. He died intestate and his only surviving heirs were the Debtor and Kelly Larman, Mr. Larman's daughter from a prior marriage.  On March 1, 2016, Kelly Larman executed a Quitclaim Deed in favor of the Debtor, conveying any ownership interest in the Property she may have had to the Debtor.

By letter dated January 23, 2015, RMS advised the Debtor that the reverse mortgage was in default and that the balance of $68,097.52 was due and payable.  The Debtor contends that this letter was not delivered to her until June 8, 2015.  By letter of April 2, 2015, RMS advised the Debtor that she may have an option to avoid foreclosure and continue to live in the Property as a surviving spouse.  However, by Letter of May 21, 2015, RMS advised the Debtor that the potential option for non-borrowing spouses had been rescinded by HUD and was no longer available.

On June 5, 2015, the Debtor responded to RMS by faxing information to RMS representative Tony Latimore.  By letter dated August 10, 2015, RMS advised the Debtor that because of a change in HUD policy, she may have additional options to avoid foreclosure and continue living in the Property.  On September 1, 2015, the Debtor once again responded to RMS by faxing additional information to Mr. Latimore.  By letter of November 5, 2015, RMS advised the Debtor that certain additional documentation was needed to determine if she was an "Eligible Surviving Non-Borrowing Spouse" under HUD guidelines.

On December 7, 2015, counsel for the Debtor sent a letter to RMS asking that it contact counsel to discuss options for the Debtor to retain the Property.  This series of letters continued

until the Debtor received a letter dated August 1, 2016 from RMS containing its "Assessment Results" regarding the Debtor's status as an "Eligible Surviving Non-Borrowing Spouse." RMS stated that the Debtor was not eligible because it did not "receive payment in full of the amounts advanced by us on behalf of the HECM loan to pay for property taxes, hazard insurance (or other property charges)," and because it "did not receive all of the documentation needed to complete the assessment." *See* Complaint at Ex. 32. The Debtor asserts that RMS has not advised the Debtor of what amounts were advanced or what documentation was not provided.

On October 26, 2016, SIW was appointed as substitute trustee under the Deed of Trust. By certified mail dated November 4, 2016, SIW announced a foreclosure sale of the Property to be held on December 16, 2016. The Debtor filed her petition under Chapter 13 of the Bankruptcy Code on December 12, 2016. The Debtor continues to reside in the Property.

The reverse mortgage secured by the Deed of Trust on the Debtor's residence was a HECM, which is authorized by the Housing and Community Development Act of 1987, 12 U.S.C. § 1715z-20. Under that program, the United States Government insures reverse mortgages originated by private lenders. HUD administers the HECM program and issued its governing regulations. *See* 24 C.F.R. §§ 206.1–206.211. The contracts of insurance between HUD and private lenders incorporate these regulations by reference. Any lender participating in the HECM program, such as AAG, must extend the loan in compliance with HUD's regulations and guidance.

The authorizing statute for the HECM program includes a section titled "Safeguard to prevent displacement of homeowner." This provision states that HUD may not insure a HECM unless such loan provides that the homeowner's obligation to satisfy the loan does not become due until the death of the homeowner or the sale of the home. *See* 12 U.S.C. § 1715z-20(j).

Further, the provision expressly states that "[f]or purposes of this subsection, the term

'homeowner' includes the spouse of a homeowner." *Id.*

The Deed of Trust states in paragraph 9(a)(i) that the loan is due and payable if a

borrower dies and the property is not the principal residence of at least one surviving borrower.

As Mr. Larman was the only borrower, his death triggered default under the Deed of Trust.

Accordingly, the Debtor asserts that the Deed of Trust does not comply with the plain language

of the enabling statute as it fails to provide for the surviving spouse as required.  The Debtor

contends that this reverse mortgage did not qualify for the HECM program and should not have

been insured by HUD.

### I.        History of the HECM Statutory Framework and Regulations

12 U.S.C. § 1715z-20 authorizes HUD to carry out a program to insure lenders who

provide HECM financing products.  This statute authorizes HUD, through its component agency

the Federal Housing Administration ("FHA"), to provide optional insurance to lenders who

authorize reverse mortgages to elderly homeowners.  These mortgages secure non-recourse notes

and the FHA insures these lenders against the risk of loss should the proceeds from the sale of

the property after the death of the borrower not yield enough to fully satisfy the loans.  Congress

imposed specific eligibility requirements for obtaining FHA insurance, but gave HUD broad

authority to dictate the terms and conditions of the insurance—which is in addition to HUD's

general rulemaking authority.

On June 9, 1989, HUD promulgated a final rule establishing the HECM program.  Under

this program, HUD offers insurance to lenders who in turn pay HUD a mortgage insurance

premium.  When an insured mortgage is not fully repaid from proceeds of sale, HUD

compensates the lender for some or all of the loss.  To qualify for HUD insurance, the loan must

meet certain criteria codified at 24 C.F.R. § 206.27.  Among these requirements, the lender must accept payment in a variety of forms and the loan must provide for full payment to come due when all borrowers have died, when the home is sold, or—with HUD's permission—when obligations to maintain hazard insurance or pay property taxes are not met.  Once the loan becomes due, the borrower or the borrower's estate may satisfy the balance by surrendering the property to the lender or by selling the property for the lesser of the loan balance or 95% of the value of the home.  In the event of nonpayment, the lender may foreclose.  When the value received by the lender is less than the debt, the lender may then file an insurance claim with HUD.  Neither the borrower nor his or her estate are responsible for any unpaid balance on the loan.  HUD minimizes risk associated with this program by establishing limits on the amount the homeowner can borrow based upon the appraised value of the property, the age of the youngest borrower on the loan, and the loan's expected interest rate.

In 1998, Congress amended 12 U.S.C. § 1715z-20 to make the HECM program permanent.  The 1998 amendment provided that HUD could insure HECM loans only where the borrower or borrower's spouse was at least 62 years of age, or such higher age as the Secretary of HUD prescribes.  HUD has determined that loans where one borrower was under the age of 62 would be uninsurable from an actuarial soundness perspective, and accordingly requires that the youngest mortgagor be 62 years of age or older.  *See* 24 C.F.R. § 206.33.  As a result, some married couples chose to have the non-qualifying spouse deed his or her interest in the subject property to the qualifying spouse to qualify for a HECM loan.  The spouse below the age of 62 would then be a "non-borrowing spouse."  Prior to August 4, 2014, the HECM loan documents for loans insured by the FHA provided that the "lender may require payment in full of all sums

8

secured by this Security Instrument if (i) a borrower dies and the property is not the principal residence of at least one surviving borrower."

In *Bennett v. Donovan*, 797 F.Supp.2d 69 (D.D.C. 2011) ("*Bennett I*"), non-borrowing spouses sued HUD alleging that certain HECM regulations were inconsistent with the HECM statute, in violation of the APA.  The court granted HUD's motion to dismiss for lack of jurisdiction because the plaintiffs lacked standing under *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).  The plaintiffs appealed, and the D.C. Circuit Court of Appeals reversed, finding that the plaintiffs had standing.  *Bennett v. Donovan*, 703 F.3d 582, 589–90 (D.C. Cir. 2013). After remand, the District Court granted the plaintiffs' motion for summary judgment and denied HUD's motion for summary judgment.  *Bennett v. Donovan*, 4 F.Supp.3d 5, 14 (D.D.C. 2013) ("*Bennett II*").   The court in *Bennett II* held that the only plausible construction of 12 U.S.C. § 1715z-20(j) was that "the loan obligation [should be] deferred until the homeowner's and the spouse's death."  *Id.* at 13.  In accordance with the APA, the District Court remanded to the agency to craft appropriate relief.

On April 25, 2014, HUD issued Mortgagee Letter 2014-07 ("ML 2014-07"), which amended 24 C.F.R. § 206.27(c) to provide a qualified period of deferral of due and payable status until the death of the eligible non-borrowing spouse for eligible HECMs issued on or after August 4, 2014.  This letter does not require an election on the part of the mortgagee or HUD for the surviving non-borrowing spouse to remain in the home.  This policy applies only to HECM loans originated and insured after August 4, 2014.

Several months after *Bennett II*, four non-borrowing surviving spouses who were not parties to the *Bennett* case filed a new lawsuit on behalf of themselves and a purported class of similarly situated individuals.  *Plunkett v. Castro*, 67 F.Supp.3d 1 (D.D.C. 2014).  The challenge

raised in this lawsuit is identical to the challenge made in *Bennett I* and *II*.  The *Plunkett*

plaintiffs allege that HUD's failure to act following the decision in *Bennett II* violated their rights

under the APA.

On January 29, 2015, HUD issued Mortgagee Letter 2015-03 ("ML 2015-03"), which

modified the HECM regulations for HECMs with case numbers issued prior to August 4, 2014

"to provide an alternative option for claim payment for an eligible HECM with an eligible

surviving non-borrowing spouse."  On June 12, 2015, HUD issued Mortgagee Letter 2015-15

("ML 2015-15").  Under this guidance, lenders can elect to foreclose as they could previously

under the insurance contract or, under a new Mortgagee Optional Election ("MOE"), they can

elect to accept an offer of amendment to their insurance contracts and assign the HECM loans to

the FHA if certain conditions are met.  These conditions are:

(1) [the non-borrowing spouse was] legally married . . . to the HECM borrower at the time of loan closing and who remained married to the HECM borrower until the HECM borrower's death; . . .
(2) [the non-borrowing spouse] [c]urrently resides and resided in the property secured by the HECM as his or her principal residence at origination of the HECM and throughout the duration of the HECM borrower's life; and
(3) [the non-borrowing spouse] has or is able to obtain—within 90 days following the death of the last surviving borrower—good, marketable title to the property or a legal right . . . to remain in the property for life.

ML 2015-15 (HUD's Ex. 1) at 6.

The District Court in *Plunkett* examined the MOE and found it did not violate the APA,

stating that "the MOE is an entirely reasonable program whereby mortgagees may assign

HECMs to HUD, so long as certain criteria are met.  The Court recognizes that this may not be

as desirable an outcome as plaintiffs would like, but the Court does not find that it was arbitrary

and capricious."  *Plunkett*, 67 F.Supp.3d at 16.  Following this determination, HUD offered the

MOE to all non-borrowing spouses in ML 2015-15.  The mortgagee must elect to participate in

the MOE program, as the surviving non-borrowing spouse cannot themselves elect to participate

in the program.


CONCLUSIONS OF LAW

**I.      Standard of Review**

HUD filed a Motion to Dismiss the Debtor's First Amended Complaint under Federal

Rules of Civil Procedure 12(b)(1) and 12(b)(6), incorporated into adversary proceedings by

Federal Rule of Bankruptcy Procedure 7012(b).[3]  AAG filed two Motions to Dismiss:  one

pursuant to Federal Rule of Civil Procedure 19(a), incorporated into adversary proceedings by

Federal Rule of Bankruptcy Procedure 7019, for failure to join a necessary party, and another

under Federal Rule of Civil Procedure 12(b)(6) that asserts numerous grounds for dismissal, such

as statute of limitations and judicial estoppel.[4]

The existence of subject matter jurisdiction is a threshold issue and accordingly must be

addressed prior to the merits of the underlying claims.  *Jones v. Am. Postal Workers Union*, 192

F.3d 417, 422 (4th Cir. 1999) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)).

Lack of subject matter jurisdiction may be raised as a defense at any stage of the proceedings.

*Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006).  "If the court determines at any time that it

lacks subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3)

(incorporated into adversary proceedings by Fed. R. Bankr. P. 7012(b)); *see also Young v. U.S.*

---

[3] The First Amended Complaint was filed May 3, 2016, after HUD filed a Motion for Judgment on the Pleadings as
to the initial complaint.

[4] AAG initially moved to dismiss the original complaint but also moved to dismiss the First Amended Complaint as
set forth in its Response to the First Amended Complaint.  AAG also filed a counterclaim against the Debtor seeking
equitable subrogation to the loan paid off by the HECM.

*Dep't of Veterans Affairs (In re Young)*, A.P. No. 16-06007, 2017 WL 3190576, at *3 (Bankr. W.D. Va. July 26, 2017).

In addressing a motion to dismiss for failure to join a necessary party, the Court must conduct a two-step inquiry. "First, the district court must determine whether the party is 'necessary' to the action under Rule 19(a). If the court determines that the party is 'necessary,' it must then determine whether the party is 'indispensable' to the action under Rule 19(b)." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Rite Aid of S.C., Inc.*, 210 F.3d 246, 249 (4th Cir. 2000). Under Rule 19(a), a party is necessary if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties, or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect the interest or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a). The question of whether a party is indispensable turns upon "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b).

In turn, under Federal Rule of Civil Procedure 12(b)(6), a party may move a court to dismiss a complaint if the plaintiff has not alleged sufficient facts, taken as true, to show that the claim for relief is plausible at best. Fed. R. Civ. P. 12(b)(6); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570–72 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of North Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). Consequently, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal,* 556 U.S. at 679.

The Court will address each motion in turn.

## I.      Motion to Dismiss Filed by HUD

The Debtor asserts three counts against HUD.  In Count One, the Debtor seeks declaratory judgment stating that HUD has failed to properly implement the anti-displacement protections in the HECM statute, that HUD has illegally adopted regulations and guidance that contravene this protection, and requiring HUD to accept assignment of the Deed of Trust.  In addition, Count One asks the Court to permanently enjoin HUD from enforcing 24 C.F.R. § 206.27(c).  In Count Two, the Debtor seeks declaratory judgment stating that the Deed of Trust in the present matter does not comply with the anti-displacement provisions of the HECM statute, that HUD acted in an arbitrary and capricious manner in insuring a loan which fails to comply with the HECM statute, and requiring HUD to accept assignment of the Deed of Trust. In addition Count Two seeks to permanently enjoin HUD from insuring loans that fail to comply with the anti-displacement provision of the HECM statute.  Count Three seeks declaratory judgment stating that the HUD regulation and guidance issued thereunder contravene the clear language of the HECM enabling statute, that HUD has failed to take the necessary actions to bring its regulation and guidance into compliance with the HECM statute, and requiring HUD to accept assignment of the Deed of Trust.  Count Three also seeks to order HUD to take all necessary steps to bring its regulations and guidance into compliance with the anti-displacement provisions of the HECM statute.

Finally, in Count Four the Debtor seeks to quiet title to the Property.  Specifically, the Debtor asks the Court to find that the Debtor "is the owner in fee simple of the residence and is entitled to quiet and peaceful possession of the residence; that the deed of trust transferring a mortgage interest in the residence to AAG is void and cancelled; and that AAG, RMS, FAR, and

HUD, or anyone claiming under them, have no estate, right, title, lien or interest in the [Property]."  Amended Complaint ¶ 89.[5]

HUD asserts that the Debtor's allegations against it challenging certain regulations are moot, that the Debtor lacks the requisite Article III standing to pursue the claims and that the Court lacks jurisdiction to entertain individual requests for assignment relief in order to avoid foreclosure.   This Court is far from the first to address the standing of a surviving non-borrowing spouse to pursue claims against HUD arising from the HECM program.  Likewise, this Court is not the first to address whether the issuance of ML 2015-15 rendered such claims against HUD moot.  In addition to *Bennett I*, *Bennett II*, and *Plunkett* discussed above, these questions were addressed in *Bombet v. Donovan*, No. 13-118-SDD-SCR, 2015 WL 1276569 (M.D. La. Mar. 19, 2015), *Harris v. Castro*, No. 1:14-cv-3110-TCB (N.D. Ga. Nov. 18, 2015) (Attachment 4 attached to Plaintiff's Response to HUD's Motion for Judgment on the Pleadings), and most recently in *Federal National Mortgage Assoc. v. Takas*, No. 2:17-CV-204-DAK, 2017 WL 3016785 (D. Utah July 14, 2017).[6]  Accordingly, the Court will examine how other courts have addressed the issues of mootness and standing.

   a.   Mootness

"A case is moot when 'the challenged conduct ceases such that there is no reasonable expectation that the wrong will be repeated' in circumstances where 'it becomes impossible for the court to grant any effectual relief whatever to the prevailing party.'" *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1135 (D.C. Cir. 2009) (quoting *City of Erie v. Pap's A.M.*, 529

---

[5] Counsel for the Debtor conceded at oral argument that cancelling the HECM against the Property would create a windfall in favor of the Debtor, as the HECM paid off the prior mortgage against the Property and replaced it with the one now in dispute. What the Debtor is really requesting is an Order allowing her to remain in the Property until her death.

[6]*Takas* was entered following oral argument on the present motions.  HUD alerted the Court to the opinion, and the Court afforded the Debtor the opportunity to submit a response addressing the court's holding in *Takas*.  The Debtor did so on July 28, 2017.

U.S. 277, 287 (2000)).  "When a case or controversy ceases to exist—either due to a change in

the facts or the law—'the litigation is moot, and the court's subject matter jurisdiction ceases to

exist also.'"  *Porter v. Clarke*, 852 F.3d 358, 363 (4th Cir. 2017) (quoting *S.C. Coastal

Conservation League v. U.S. Army Corps of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015)).  "Put

differently, 'a case is moot when the issues presented are no longer 'live' or the parties lack a

legally cognizable interest in the outcome.'"  *Id.* (citing *Powell v. McCormack*, 395 U.S. 486, 496

(1969)).

There is an exception to the mootness doctrine that states that "a defendant's voluntary

cessation of a challenged practice does not deprive a federal court of its power to determine the

legality of the practice."  *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982).

This exception "traces to the principle that a party should not be able to evade judicial review, or

to defeat a judgment, by temporarily altering questionable behavior."  *City News & Novelty, Inc.

v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001).  "To that end, 'a defendant claiming that its

voluntary compliance moots a case bears the formidable burden of showing that it is absolutely

clear the allegedly wrongful behavior could not reasonably be expected to recur.'"  *Porter*, 852

F.3d at 364 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S.

167, 190 (2000)).

The courts examining this issue have arrived at differing conclusions.  The *Plunkett* court

addressed the question of whether the MOE and a related program called the "Trigger

Inapplicability Decision" ("TID") [7] rendered similar claims to the present case moot.  In that

case, HUD offered the MOE and TID options as a direct result of the litigation.  With little

discussion of the issue, the *Plunkett* court stated that "insofar as HUD adopted this position as a

---

[7] HUD offered the TID as a form of relief to the *Plunkett* plaintiffs.  Under that program, the death of the borrowing spouse would not trigger default under the Note.  Ultimately HUD only offered this option to the six *Bennett/Plunkett* plaintiffs and did not offer the option to the broader universe of surviving non-borrowing spouses.

result of the present litigation, under the voluntary cessation doctrine, HUD's decision 'does not

deprive a federal court of its power to determine the legality of the practice . . . [because i]f it

did, the courts would be compelled to leave [t]he defendant . . . free to return to his old ways.'"

*Plunkett*, 67 F.Supp.3d at 12 (quoting *Laidlaw*, 528 U.S. at 189).

The *Harris* court followed *Plunkett* and found that the voluntary cessation doctrine

applied and thus the plaintiff's claims were not moot. The court addressed the question of

voluntary cessation through the lens of three factors enumerated by the Eleventh Circuit Court of

Appeals in *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1183–84 (11th Cir. 2007).

These factors are:

> (1) whether the challenged conduct was isolated or unintentional, as opposed to a
> continuing and deliberate practice; (2) whether the defendant's cessation of the
> offending conduct was motivated by a genuine change of heart or timed to
> anticipate suit; and (3) whether, in ceasing the conduct, the defendant has
> acknowledged liability.

*Id.* at 1184. The *Harris* court found that HUD's failure to protect surviving non-borrowing

spouses were not isolated decisions, but rather broad reaching policies. The court also took issue

with HUD's decision to correct the policies through the issuance of mortgagee letters rather than

by repealing the challenged regulation. In addition, the *Harris* court found that HUD had not

demonstrated a genuine change of heart, and instead demonstrated a reluctance to extend relief to

the surviving non-borrowing spouses. Finally, the *Harris* court found that HUD's mortgagee

letters and subsequent actions did not convey a recognition of liability under the APA, but rather

construed the holdings of *Bennett* and *Plunkett* as narrowly tied to a unique set of facts.

Recently the *Takas* court also addressed the mootness question. Unlike *Plunkett* and

*Harris*, *Takas* did not address voluntary cessation. Instead, that court found that "HUD has

already provided the relief that Ms. Takas is requesting to the extent that it has the authority to

provide that relief." *Takas*, 2017 WL 3016785, at *3.  The court noted that, following the

determination in *Bennett II* that HUD failed to properly implement 12 U.S.C. § 1715z-20(j),

HUD changed its regulations to be consistent with the statute.  Presumably, the change in policy

*Takas* was referring to was the issuance of ML 2015-03 and subsequently ML 2015-15.

Importantly, *Takas* stressed that HUD does not have authority to mandate assignment of a

mortgage or to otherwise interfere with a lender's decision to foreclose under loan documents to

which HUD is not a party.  Thus, according to *Takas*, HUD's issuance of the mortgagee letters

provided all the relief that HUD is authorized to provide, and accordingly the plaintiff's claims

were moot.

> b.  Standing

The Supreme Court articulated constitutional standing requirements as follows in *Lujan*

*v. Defenders of Wildlife*, 504 U.S. 555 (1992):

> Over the years, our cases have established that the irreducible constitutional
> minimum of standing contains three elements. First, the plaintiff must have
> suffered an "injury in fact"—an invasion of a legally protected interest which is
> (a) concrete and particularized, see *id.,* at 756, 104 S.Ct., at 3327; *Warth v. Seldin,*
> 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975); *Sierra Club v.*
> *Morton,* 405 U.S. 727, 740–741, n. 16, 92 S.Ct. 1361, 1368–1369, n. 16, 31
> L.Ed.2d 636 (1972); and (b) "actual or imminent, not 'conjectural' or
> 'hypothetical,' " *Whitmore, supra,* 495 U.S., at 155, 110 S.Ct., at 1723 (quoting
> *Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675
> (1983)). Second, there must be a causal connection between the injury and the
> conduct complained of—the injury has to be "fairly . . . trace[able] to the
> challenged action of the defendant, and not . . . th[e] result [of] the independent
> action of some third party not before the court." *Simon v. Eastern Ky. Welfare*
> *Rights Organization,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450
> (1976). Third, it must be "likely," as opposed to merely "speculative," that the
> injury will be "redressed by a favorable decision." *Id.,* at 38, 43, 96 S.Ct., at 1924,
> 1926.

*Id.* at 560–61.  The last element is sometimes referred to as "redressability."  The question of

standing of surviving non-borrowing spouses in actions filed against HUD post-*Plunkett* has

turned on the issue of redressability.  While *Harris* did not address standing, both the *Bombet*

and *Takas* courts found that the plaintiffs could not demonstrate redressability following the

issuance of ML 2015-03 and later ML 2015-15.

     *Bombet* examined ML 2015-03 and compared it with the relief offered to the

*Bennett/Plunkett* plaintiffs.  Noting that the TID had been offered to those plaintiffs, but not

subsequently incorporated into ML 2015-03, the court ordered the parties to submit briefs on the

issue of whether HUD could provide a legitimate reason for treating similar cases differently.

The *Bombet* court was satisfied by HUD's explanation that, in fact, the TID put surviving non-

borrowing spouses residing in homes encumbered by pre-August 4, 2014 HECMs in a

substantially better economic position than their counterparts residing in homes encumbered by

post-August 4, 2014 HECMs.  *See Bombet*, 2015 WL 1276569, at *4 n.31.  Accordingly, the

court found that ML 2015-03 had the legal effect of placing all surviving non-borrowing spouses

in a substantially similar economic situation.  Importantly, the court noted that there was nothing

it could do to preclude the lender from seeking foreclosure against a non-borrowing spouse.  The

court also stated that if it were to hold the regulation invalid, it would be required to remand the

case to HUD to fashion relief as the court would be without power to order HUD to provide a

particular form of relief.  For these reasons, the *Bombet* court found the plaintiff had not shown

redressability sufficient to maintain standing.

     *Takas* likewise found that HUD had provided a means through ML 2015-15 by which the

lender could exercise its discretion and redress the plaintiff's injury.  Ultimately, however, the

lender chose not to pursue that option.  The court noted that HUD was not a party to the HECM,

and thus had no authority to alter the terms of the loan.  Instead, HUD provided the lenders with

the MOE option to provide for assignment to HUD as an alternative to foreclosure.  The court

stressed that HUD could not force lenders to take advantage of the MOE and that lenders remain free to pursue foreclosure if foreclosure is allowed under the terms of the loan.  In addition, the court emphasized the language of 12 U.S.C. § 1715u(f), which states that "[n]o provision of this Act, or any other law, shall be construed to require [HUD] to provide an alternative to foreclosure [for lenders with insured mortgages] or to accept assignment of such mortgages." *See Takas*, 2017 WL 3016785, at *4.[8]  The court also cited *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 63–64 (2004), which states that "[t]he only agency action the court can compel is discrete agency action that is legally required."  *Id.*  Ultimately, as in *Bombet, Takas* concluded that the plaintiff had not shown redressability sufficient to maintain standing for her claims against HUD.

### c.  Discussion

HUD concedes that the Debtor has satisfied the injury in fact element, but asserts that the Debtor cannot satisfy the causation or redressability elements.  The Court does not reach the causation issue as it agrees with the conclusions reached by the *Bombet* and *Takas* courts that the Debtor has not demonstrated redressability sufficient to maintain standing for her claims against HUD.  To maintain Article III standing, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 561 (internal quote omitted).  The MOE was an option in the Debtor's case by which RMS could choose to assign the Deed of Trust to HUD rather than foreclose on the Property.  However, RMS asserts the

---

[8] It is for this reason the Court does not accept the Plaintiff's request that it review HUD's decision not to extend the TID or "Hold Election" to all non-surviving spouses.  Notably, in Mortgagee Letter 2015-03, HUD recited that it had analyzed both the MOE and the Hold Election and both were costly.  HUD went on to observe that "[e]ither option, even if offered alone, poses a significant financial impact to the FHA insurance funds.  The Hold Election when applied to the universe of mortgages involving Non-Borrowing Spouses of borrowers imposes a financial risk to the insurance funds that is simply too great.  FHA's obligation to protect the soundness of the insurance funds makes it impossible to offer this option broadly. Thus, even though it also poses a (lesser) financial risk to the funds, the only alternative path to claim payment that FHA will permit mortgagees to elect is the [MOE] Assignment." *See* Attachment 2 to Plaintiff's Response to HUD's Motion for Judgment on the Pleadings, at p 3-4.

Debtor was unable to comply with the MOE given that she failed to reimburse RMS for funds advanced by it for property taxes, hazard insurance, or other related charges. *See* Plaintiff's Exhibit 32. Whether or not this is true is seriously concerning to the Court.

It is troubling that the August 10, 2015 letter to the Debtor advises that as of that date, the amount due for taxes and insurance advanced on behalf of the borrower was "$0.00." *See* Plaintiff's Exhibit 19.  The Debtor was also told by RMS there were no tax and/or insurance advances on January 28, 2016.  *See* Plaintiff's Exhibit 23.  It is further troubling that on November 5, 2015 the Debtor was advised that she had ninety (90) days from the death of borrower, Mr. Larman, to provide proof that she had or was able to obtain "good, marketable title to the Property or a legal right to remain in the Property for life." *See* Plaintiff's Exhibit 21. Mr. Larman died on January 21, 2015.  By the time she was advised of this information, the time had already run.  In addition, as late as June 3, 2016, RMS was still advising the Debtor she was being assessed for possible deferral of foreclosure by RMS by participation in the MOE program.  It was not until August 1, 2016 that she was told she was assessed by RMS to be ineligible for the MOE for two reasons: (1) RMS did not receive payment in full for amounts advanced by it on behalf of the HECM loan for taxes, insurance or other charges, and (2) RMS did not receive all documentation needed to complete the assessment.  Plaintiff's Exhibit 32. [9]

HUD has taken action to redress the Debtor's injury by offering the MOE option to its approved mortgagees.  At the end of the day, it is just that, an option.  The mortgagee can take advantage of the option or not.  The Debtor may well have been eligible for the MOE had she been given timely or proper opportunity to take advantage of it.  It is far from certain whether she was given that opportunity in this case by RMS, or whether RMS properly evaluated her

---

[9] RMS also advised the Debtor's counsel by letter dated February 16, 2016 that "RMS has requested HUD to allow more time for this information to be submitted."   Plaintiff's Exhibit 26.  Whether and to what extent HUD has the discretion to modify the MOE deadlines is unclear at this stage.

eligibility, but that is not because HUD did not make the option available to her

mortgagee/servicer.   The Court further agrees with *Takas* that HUD's issuance of the mortgagee

letters provided all the relief HUD is authorized to provide, and that the Debtor's claim against

HUD is moot.  No authority has been provided to the Court that HUD has the authority or

obligation to police application of the mortgagee letters, and the Court is aware of none.

The Debtor argues that her claims would be redressed if HUD were to extend the TID to

her case.  Importantly, however, as noted above, this Court is without power to require HUD to

offer such a particular form of relief.  *See Takas*, 2017 WL 3016785, at *4 (citing 12 U.S.C.

§ 1715u(f); *see also Norton*, 542 U.S. at 63–64).  Further, the Debtor has asked the Court in the

Amended Complaint to order HUD to accept assignment of the mortgage.  This relief is

expressly prohibited by the National Housing Act, and the Debtor does not have standing to

pursue such a claim.  As to the Debtor's APA claims, the *Bombet* court concluded after

supplemental briefing on the issue that the MOE addressed the problems of disparate treatment

among surviving non-borrowing spouses.  The Court is in agreement.  The Court finds that

redressability is absent as to HUD, and does not exist to the extent necessary to support Article

III standing.  Accordingly, the Court will grant HUD's Motion to Dismiss.

## II.    Motions to Dismiss filed by AAG

The Debtor has asserted two counts against AAG.  In addition to Count Four seeking to

quiet title to the property, discussed above, the Debtor has asserted Count Five, which asks the

Court to find that AAG engaged in a course of conduct that misrepresented to Mr. Larman and

the Debtor the consequences of obtaining a reverse mortgage, that the misrepresentations were

relied upon by Mr. Larman and the Debtor in taking out the reverse mortgage, and that as a

consequence of that course of conduct the Debtor suffered, or may in the future suffer, financial

injury in the loss of her home.  In addition, this count seeks declaratory judgment permanently enjoining the defendants from proceeding with a foreclosure sale under the reverse mortgage.

AAG moves to dismiss on numerous grounds.  At oral argument on the motions, counsel for AAG narrowed the scope of the motions to two issues.[10]  First, AAG is seeking dismissal of the action for failure to join a necessary party.  Second, AAG is seeking dismissal, presumably under Rule 12(b)(6), based upon the statute of limitations.  Each argument will be addressed in turn.

### a.  Failure to Join a Necessary Party

AAG argues that Kelly Larman must be joined as a party to this adversary proceeding. AAG asserts that the cause of action the Debtor is pursuing was held jointly by the Debtor and Mr. Larman.  Upon Mr. Larman's death, AAG contends than Kelly Larman became the owner of an undivided two-thirds interest in the present cause of action by operation of Va. Code Ann. §§ 64.2.200(a)(1) and 64.2-201.  AAG further asserts that Kelly Larman is subject to service of process and that her joinder will not deprive this Court of subject-matter jurisdiction.  AAG argues that in the absence of Kelly Larman, the Court cannot accord complete relief among the parties and that disposing of the adversary proceeding in her absence would leave the defendants subject to a substantial risk of incurring double or otherwise inconsistent obligations.

The Debtor, by contrast, asserted at oral argument that when Kelly Larman executed the Quitclaim Deed conveying any interest she may have had in the property to the Debtor, she also transferred any interest she may have had in causes of action that flow with the Property. Accordingly, the Debtor does not believe that Kelly Larman is a necessary party for the Court to

---

[10]  AAG also moved to dismiss the complaint on the grounds of (1) judicial estoppel and (2) lack of applicability of the consent order to AAG.  Even though the Debtor did not respond to these grounds, AAG did not pursue them at argument on its motions.  These grounds will be deemed withdrawn without prejudice.

accord complete relief in this matter nor that failure to join Kelly Larman would leave the defendants subject to double or inconsistent obligations.

The Court does not find that Kelly Larman is a necessary party. Kelly Larman was not involved in the transaction that forms the basis of the Debtor's claims. While she may have inherited an interest in any causes of action her father held at the time of his death, the Court believes that Kelly Larman's decision to transfer her interest in the Property to the Debtor by the Quitclaim Deed demonstrates that, as a practical matter, she has little desire to involve herself in litigation surrounding the Property. The Court is satisfied that it can accord complete relief among the existing parties. This is a non-recourse loan, and the Court does not believe the failure to join Kelly Larman will invoke any of the triggers in Rule 19(a). Accordingly, AAG's Motion to Dismiss for Failure to Join a Necessary Party will be denied.

### b. *Statute of Limitations*

AAG has also moved to dismiss based upon the statute of limitations. The parties are in agreement that the Debtor's claims against AAG are subject to the two-year statutes of limitations contained in Va. Code Ann. § 8.01-243(A) (personal injuries) and (B) (injuries to property). The dispute arises as to when the cause of action accrued, and consequently when the statute of limitations began to run. Va. Code Ann. § 8.01-249(1) states that a cause of action for fraud or mistake begins to accrue "when the fraud, mistake, misrepresentation, deception, or undue influence is discovered or by the exercise of due diligence reasonably should have been discovered." Va. Code. Ann. § 8.01-249(1).

AAG asserts that there are sufficient facts in the pleadings to find that the Debtor's cause of action accrued on September 7, 2011 upon execution of the reverse mortgage. AAG contends that at that time, the Debtor was apprised of enough "red flags" that with the exercise of due

diligence would have alerted her to the fact that she would not be eligible to remain in the Property following Mr. Larman's death. The Debtor, by contrast, asserts that there are questions of fact as to when the Debtor should have become aware of the fraud that form the basis for her cause of action. The Debtor further contends that she relied upon statements the AAG representative made during the execution of the reverse mortgage that led her to believe she would be eligible to remain in the Property following Mr. Larman's death. Accordingly, the Debtor argues that the doctrine of equitable estoppel should preclude AAG from raising the statute of limitations defense.

The Court believes there are significant questions of fact as to when the Debtor's cause of action against AAG accrued. As the Virginia Supreme Court stated as to the statute of limitations in a fraud action, the issue of "[w]hether . . . due diligence has been exercised must be ascertained by an examination of the facts and circumstances unique to each case." *STB Marketing Corp. v. Zolfaghari*, 240 Va. 140, 292 S.E.2d 394, 397 (1990). The facts and circumstances of AAG's statements at the execution of the reverse mortgage or of the Debtor's understanding of the transaction at that time have not been sufficiently developed at this early juncture of this case for the Court to make a determination. Accordingly, the Court will deny AAG's Motion to Dismiss based upon the statute of limitations without prejudice.

<u>CONCLUSION</u>

For the foregoing reasons, the Court will grant HUD's Motion to Dismiss as to all claims against it and deny AAG's motions to dismiss.

A separate Order will be entered contemporaneously herewith.

Decided this 17th day of August, 2017.

_____
UNITED STATES BANKRUPTCY JUDGE